Gaston, Judge.
 

 The plaintiff founds his claim to relief, not on the ground of the specific execution of a contract respecting the sale of a tract of land, buton the ground that the defendant has taken an unconscientious advantage of the plaintiff, in getting his land at a price below its value, and below what if; would have commanded had not competition at
 
 *414
 
 the sale been prevented by the defendant’s unfair practices. We have diligehtly examined the proofs to ascertain whether they make out this claim to relief. If they do, the 'act of 1819 is certainly not in his way. How it might be, if the bill were brought simply to execute the agreement between the parties, it is not necessary to determine. Whatever difficulty there may be in ascertaining the truth of this transaction in other respects, it is certain that an almost universal belief prevailed among those present at the sale, that the defendant was purchasing or bidding as a friend of the plaintiff, and under some agreement for the benefit of the > plaintiff. Fourteen persons who were present at the sale have been examined, and eleven of these, and among them the trustee and the crier who conducted the sale, state explicitly that such was their impression; and several of them testify, that such was, as far as they had means of knowing, the belief of all the bystanders. One of the remaining three, Col. Mitchell, states what took place, and says nothing as to what was his impression. The other two testify only that they heard nothing said, and saw nothing done by the defendant, to excite this belief; but even one of these (Russel) it is shown by other testimony, when called on to bid at the sale, declined to do so, and gave as a reason that he could not get the property, as the plaintiff had a bidder there to befriend him. It is also satisfactorily shown, that the effect of this general impression and belief, was to put down competition, and to enable'the plaintiff to get the land at a price, not only below its value, but less than that which it would otherwise have commanded. It could scarcely have been otherwise. After a price had been offered sufficient to indemnify the sureties, not only the ordinary inducements for competition would be removed by the belief of such friendly arrangement between the debtor and one of the bidders, but a further interference with the bidding would have been deemed an odious act. That the land was sold below its real value, is not to be doubted. The defendant admits that he had intended to bid as far as^seven hundred dollars; and seems to have expected to secure thereby, a debt of upwards of
 
 *415
 
 seventy dollars, which the plaintiff owed him. The persevering efforts of the plaintiff to redeem, and the strenuous resistance on the part of the defendant to redemption, furnish full evidence that the .purchase if an absolute one, was
 
 “ a bargain.”
 
 But the effect of this impression, to put down competition is expressly proved. Douglass, the crier, in his first deposition, testifies, that William M'Murray arrived after the land was set up for sale, and seemingly in haste, bid for the land several times, that suddenly he stopped bidding, requested the crier not to be in haste, and went off, saying that he would return presently, and then say whether he should bid again or not: that after some time he returned and said to the crier (but the witness does not know or believe that this was heard by the defendant,) that he had come for no other purpose than to be friend Neely, by buying the land, and giving him an opportunity to redeem; but as Neely had got Torian to befriend him, he should not bid
 
 against Torian ;
 
 and thereupon, in the words of the witness, “ I continued to cry the property, and made every exertion I could to get a
 
 higher bid,
 
 but found it in vain. The trust was satisfied. I was told Mr. Torian was to befriend Neely, by giving him time to redeem the land and mill, and
 
 so
 
 Mr. Torian was the last and highest bidder.” M'Murray testifies that he did bid for the land, and should have bid more, but that Green W. Brown informed him that there was an understanding between the plaintiff and defendant, which stopped him. That the witness then apologized, to Neely for having bid, and that Torian was not far off when he made the apology; and that in the evening after the sale, the witness said something to the defendant, but he does not distinctly recollect what, about the redemption; when the defendant replied, “ if Neely will do right I will.” What was the precise agreement between the plaintiff, if any, in relation to the defendant’s purchase, and whence arose the general belief that the defendant’s purchase was not to be an absolute one, are inquiries involved in more doubt. The first material circumstance bearing upon these questions, appears from the testimony of Enos Ross. A short time before the day of
 
 *416
 
 sale, the witness was at the mill of the defendant, and inquired of him, whether the plaintiff’s mill would be sold ? When defendant said that he expected not; for that the plaintiff could get four hundred dollars for his negro boy from Brooks ,* and the suit which the plaintiff had against Roan, would enable him to do without selling the mill, as he could raise the balance upon the strength, (meaning no doubt the
 
 security)
 
 of his mill.
 

 The information respecting the sale of the boy to Brooks was correct, for we learn from
 
 his
 
 testimony, that although he bid off the boy at the trustee’s sale, it was in formal completion of a prior contract between himself and the plaintiff, to purchase the boy at the stipulated price of four hundred dollars., Green W. Brown arrived at the place of sale at an early hour, and was applied to by the plaintiff, to purchase the land,, and hold it as a security, until the plaintiff could redeem it. Brown declined acceding to the proposition; and then learned from the plaintiff, his determination to have every other thing in the trust-deed sold, rather than the land, unless he could get some one to befriend him. About this time, but before any sale had begun, it appears from the testimony of Thompson Neely, the defendant came into the mill, examined her, and asked whether the plaintiff (witness’s father,) had made any arrangements to save the mill; when witness informed him that his father and Brown were at the house together, and as witness expected, engaged upon that business. The plaintiff and Brown returned; and then the plaintiff applied to the defendant to befriend him, buy in the mill, and wait until he could raise the money. The defendant, according to the testimony of this witness, at first declined; stating as a reason, that he should be obliged to borrow the money, or a part of it at least, if the plaintiff did not have it ready by the Wednesday or Thursday week, the return term of the execution. The plaintiff expressed his confidence, that he could get the money by that time, through Maurice Smith, of Granville, to whom Wm. M'Kissack, of Person, had promised to recommend him; and added, that if he should fail to get the money in time, he would pay the defendant
 
 any interest
 
 defendant
 
 might
 
 
 *417
 

 require;
 
 observing at' the same time, that he had money due to him. The defendant asked, what if the plaintiff should not get the money by the time, was the defendant to do; and what security would he have? and the plaintiff answered,
 
 “
 
 hold on the land, it is good for the money any timeand the defendant replied, that he believed it was. The witness further states, that the defendant said he must walk out, but would see the plaintiff again: that sometime afterwards, he saw the parties ancl Col. Mitchell together in conversation, and when they separated, he walked to Col. Mitchell, and asked him what they were going to do; when the colonel said they were going to sell the
 
 boy
 
 first, and then the defendant was to buy in the land for his father, and give him a reasonable time to pay it. The next testimony in point of time, and very important testimony it is, is that of Col. Samuel Mitchell. As one of the sureties for whose indemnity the property had been conveyed,
 
 he
 
 attended at the sale. He declares that he was called to the parties, plaintiff and defendant, by one or the other, but is not positive which : that the defendant said that he had an idea of bidding for the land and mill but that he had not the money in hand: that the witness observed, that if the money was paid by the Wednesday of the following week, (the week of Caswell County Court,) it would be as good as at the present moment: that the plaintiff stated that by that day, he thought he could pay the money himself, for that he had a prospect of getting it from Wm. M'Kissack, and should go in a day or two, and get it and pay it to the trustee: that the defendant replied, if you can do so, you can still retain your land and mill: that plaintiff inquired, if he should fail to get it in time, but should get it in a few days, or otherwise in some short and reasonable time afterwards, whéther jt would not answer the purpose; and the defendant replied, that he did not know that it would make any difference; witness added, “with interest?” and defendant said
 
 that
 
 was understood. The witness adds, that he did not understand that the defendant had determined to bid off the land
 
 at any rate,
 
 and that he does not^recollect, nor does he think that he told young Neely, that the defendant was to bid
 
 *418
 
 off the land, and allow his father to redeem it, or words to that import. It then appears, that immediately after this conversation between the parties and Col. Mitchell, the negro boy which Brooks had contracted with the plaintiff to buy at four hundred dollars, was set up and bid off by him; and then the land was set up : that the defendant took his seat; had no conversation with any one in relation to his purposes, and after some bids by Col. Mitchell, M'Murray, and others, became the highest bidder, as stated by Douglass.
 

 Before passing upon the .effect of this evidence, it is proper to consider of some remarks which have been made upon the testimony of young Neely. The young man represents the defendant as stating before the conversation with Mitchell, that he might be obliged to borrow the money, if it was not ready by the Wednesday or Thursday of the next county court; and it is asked how could he know, as the sale was advertised to be for cash, that the parties interested would wait for the money until that time ? It does not seem to us, that this supposed incongruity, subjects his testimony to suspicion. It was known that the sole object of the sale was to have the money in time to satisfy the execution; and it could scarcely be doubted, but that the persons interested would not object to an indulgence which was consistent with this object. The defendant’s answer informs us, that when he was distinctly assured by Colonel Mitchell, that the indulgence would be granted to him if he bought, Colonel Mitchell said that the plaintiff had been previously informed, that
 
 he
 
 should have this indulgence; and it is exceedingly probable, that the defendant was apprised by the plaintiff of this previous assurance. It was natural, however, for the defendant, notwithstanding such his belief, and such information from the plaintiff, to get a distinct and direct assurance from Colonel Mitchell, before he ventured to act upon the faith of this supposed indulgence. So far as there may be a discrepancy between the testimony of Col. Mitchell, and that of Thompson Neely, we have no hesitation in placing superior confidence in the accuracy of the former. We believe, therefore, that he did not tell Thompson Neely
 
 *419
 
 that the defendant was to bid off the land, particularly as Col. Mitchell did not understand that the defendant had bound himself to bid it off at any rate; but we have little doubt, that in answer to young Neely’s inquiries, he stated what had taken place; and it was very natural for the latter, after what had occurred in the mill, to understand the communication as he represented it.
 

 From this testimony we infer, that the defendant knew that the plaintiff was anxious to prevent the sale of this tract of land, and believed that the plaintiff might save himself from this evil, by procurihg money upon the security of this land to pay the balance of what was required to be raised : that with this knowledge of the plaintiff’s necessities and wishes, and this belief of his ability to save the land, he encouraged the plaintiff to believe, that his object would be effected through the means of a formal sale to the defendant, who would not take a title, if the plaintiff should be able to raise the sum demanded, by the Wednesday of the succeeding week, and -would permit the plaintiff, if disappointed in then raising the money, and the defendant should be obliged to advance it, to redeem the land by repayment of the sum advanced and interest, (possibly more than ordinary interest,) within a reasonable time: that the plaintiff caught eagerly at the expectations thereby excited, and in full confidence that they were well founded, not only declined farther efforts to save this land, the home of himself and his family, and the property which he was most reluctant to part with, either by a sale of the other articles comprehended in the deed of trust, or by arrangements to obtain aid from his friends on the faith thereof: that the defendant could not but see that he had raised these expectations, excited this confidence, and thereby induced the plaintiff to direct the land to be set up for sale: that the defendant also foresaw, that upon a sale so directed, he was likely to purchase the land without full competition; and that he has thus obtained it at a price much below its actual value, and less than it would have brought had a fair competition taken place. But these inferences of unfairness on the part of the defendant, are supposed to be repelled by
 
 *420
 
 the testimony of JDr. M'Mullin. He states, that on Friday, the 6th of April, he applied to the plaintiff, in order to get the courses of the land, by which to make out the deed from himself as trustee to the defendant as purchaser; and that the plaintiff produced the original title-deed from which he extracted them: that the plaintiff inquired of him whether he intended to charge commissions ; and upon being answered in the affirmative, declared that he would not allow them, as they were already charged by the sheriff: that the plaintiff went with the witness to the defendant, to forbid the defendant from paying commissions to the trustee: that he heard nothing said against the deed, nor did the plaintiff, on that occasion, allege, that any understanding existed between him and the defendant: that as the plaintiff and witness were walking on, the plaintiff complained that his property had sold far below its value: that the witness remarked that it was very possible the land would have sold for a higher price if an impression had not existed among some of the persons present, that the defendant was purchassing or bidding as the plaintiff’s friend, and was to give him the privilege of redemption; when the plaintiff disavowed the alleged understanding with indignation, and as though he was offended that such an impression should have existed. The witness does not testify as to what occurred after he and the plaintiff reached the defendant’s house, farther than that in answer to an interrogatory of the defendant, he stated, that there was a balance left in defendant’s hands, after satisfying what the trustee wanted; that no objections were made thereto by the plaintiff, and he was under an
 
 impression
 
 that there was to be a
 
 settlement
 
 between the parties: that he “
 
 had
 
 heard” (but does not state when), the defendant say, that the plaintiff owed him about seventy dollars. On the same day the witness took a receipt from the plaintiff for the whole amount of defendant’s bid, in order to close the trust; and on the 20th April afterwards, he returned to the plaintiff, twenty-one dollars ninety-five cents commissions, which until then he had retained on the amount of the sales, made by him under the deed of trust.
 

 It is not so much what appears upon this deposition, as
 
 *421
 
 what does not appear, and might reasonably have been expected to appear, had it occurred, that renders it difficult to reconcile this deposition, with the testimony already examined. It is not so strange, that the plaintiff should have
 
 said nothing
 
 to the witness against making the deed, or in relation to the understanding between the plaintiff and the defendant, for the witness came in character of trustee, and no understanding between the plaintiff and defendant, could discharge the trustee from the obligation to make the deed, when the defendant was ready to pay the money. The trustee had no concern whatever with that understanding. But it is strange if we are to collect from this deposition that such was the case, that nothing was said about the defendant paying the money so much in advance of the day when the sureties for whom the trustee acted, required it to be paid. The deposition, however, does not negative the fact of any remark being made on that subject; and as it is expressly stated in Thompson Neely’s deposition, and as from the manner in which testimony is taken in our courts of equity, the contents of that deposition were known to the defendant, and he has not by a re-examination of Dr. M'Mullin, as he might have done, contradicted Neely; in this respect we must conclude that Dr. M'Mullin is not to be understood as intending to negative the fact. The witness Neely states, that on the second day after the sale, (we presume it was on the third, for the Dr. had probably by means of his memoranda, the means of affixing the day wúth most precision,) the trustee came'to his father’s house, and requested his father to aid him in making out the deed for the land, and the plaintiff inquired, why he wanted to prepare the deed ? when the trustee observed that he was going to draw the money, and the defendant required,to have a deed before he paid it; and that the plaintiff did remark, that this was contrary to their understanding, for thaf the money was not to be drawn from defendant, until the Wednesday or Thursday of next week: that the plaintiff asked, how much of the money he meant to draw? and M'Mullen said, the whole amount bid; when the plaintiff forbade him taking more than was
 
 *422
 
 required to satisfy the trust: that the plaintiff also objected to paying the trustee any commissions, because a commission had been allowed to the sheriff; and adds, that M'Mullin, assigned as a reason for not waiting for the money, that he was responsible for it as trustee — had no security for it — and, therefore, would have the money. This testimony is not in conflict with that of the other witnesses. The understanding referred to, is not the understanding between plaintiff and defendant, to which Dr. M'Mullen declares no allusion was made, but the understanding between Col. Mitchell on the one side, and the plaintiff and defendant on the other. The reason ássigned for requiring such immediate payment, is at least plausible, and the
 
 only
 
 circumstance to be found in the case, tending to explain the unexpected haste with which the trust was closed. The undérstanding that the money was not to be demanded until' the Wednesday of the the court, is admitted by the answer, is proved by Col. Mitchell, and can scarce be believed to have been unknown to the trustee. It is difficult to understand how the plaintiff could have disavowed any understanding with .the defendant, with regard to the sale not being purely absolute, unless it be an understanding which he supposed could be
 
 enforced.
 
 As to the fact of some understanding to that effect, there is no doubt. The defendant admits in the answer, that the sale was not to be absolute if the money were raised in three days. Col. Mitchell declares, that it was certainly not to be absolute if the money were raised by the Wednesday of court, nor if paid with' interest in a short time thereafter.* The defendant admitted to William M'Murray, that there was some understanding, and that if the plaintiff did what was right,
 
 he
 
 should; and Enos Rogers states, that two weeks after the sale, he observed to the defendant, that the defendant had got the land very low, but supposed that Neely had, the chance of redeeming it; when defendant answered, that “ he had had the chance, but that defendant did not know how it was then.” The indignation which the plaintiff manifested was indeed natural, if it were excited by the
 
 effect
 
 on the sale of his land, consequent upon the
 
 *423
 
 belief that the defendant was acting as his friend; or at the discovery that this belief was about to prove unfounded; or if directed against the defendant, or the trustee for the harshness of the course apparently about to be pursued against him, but is inconceivable unless the witness misapprehended either its cause or its object.
 

 This deposition is silent with regard to a very important part of this case, of which some explanation ought to be given by the defendant — and of which, if any satisfactory one could be given, this witness had the peculiar means to know it — why was it that the defendant paid the purchase-money before the day, when, according to his own statement,
 
 he
 
 was to be permitted to retain it ? and according to Col. Mitchell’s testimony,
 
 the plaintiff
 
 was to be allowed to raise it. Had the plaintiff declared his inability to procure the money? Had he waived the indulgence so anxiously stipulated for ? Was it because of the importu-nities of the trustee upon the defendant to close the trust, and to be freed from responsibility? Did the defendant remind the trustee, that the delay was for the plaintiff’s accommodation', rather than for the defendant’s? Or, rather, was the defendant himself prompt and eager to pay the money, and get a title as soon as a deed could be prepared ? Even the three days of grace, which he concedes, in his answer, were to be allowed, had not elapsed, before he foreclosed the plaintiff; and not a fact is shown to account for this manifest departure from the understanding of all parties, in relation to the sale; a departure, which had certainly a tendency to discourage the defendant from making efforts to raise the money, and which it is very difficult to reconcile to fair dealing.
 

 Our conclusion upon the whole testimony is, that the defendant has deceived an embarrassed man into an assent to the sale of his land to the defendant, through the trustee, by taking advantage of his distress, and exciting false hopes that the sale should not be treated as absolute, but that the land might be redeemed within a reasonable time. That thereby the defendant has obtained the land at an inadequate price; and at a price less than the plaintiff, but for this deception, would have procured; and that, in
 
 *424
 
 conscience, the defendant cannot retain the unfair gains thus acquired, but can avail himself of his legal title only, as a security for what has been advanced on the faith of it.
 

 Connecting the circumstances mentioned, as before stated in the deposition of Dr. M'Mullin, relative to a settlement between the parties, with the fact stated in John M'Murray’s deposition, that when the plaintiff tendered to the defendant the price he had paid for the land, he also offered to pay the defendant’s shop-account, we feel ourselves warranted in holding, that the demands which the defendant had against the plaintiff, when the sale took place, were intended by both parties to be secured thereby, and ought therefore to be regarded as advances. If these have not been satisfied, the defendant may have their amount ascertained by a reference.
 

 The purchase-money is already in court, and the defendant is permitted to receive it, whenever he may make demand therefor. If the account should not be taken before the 20th July next, the defendant must be understood to waive it.
 

 The plaintiff is declared entitled, on payment of any balance of account that may be found due, to have a decree for a perpetual injunction against disturbing his possession of the land in question; for the payment, by the defendant, of all the costs in the action of ejectment, heretofore brought; for a conveyance, by the defendant to the plaintiff, of the said lands, with covenants against the acts and incumbrances of the defendant; and for the costs of the plaintiff in this suit; to be taxed by the clerk thereof.
 

 PeR Cukiam. Decree accordingly.